## MASSACHUSETTS PROTECTIVE ASS'N, Inc., v. UNITED STATES.

### No. 6066.

District Court, D. Massachusetts.

March 16, 1938.

Claude R. Branch and F. H. Nash (of Choate, Hall & Stewart), both of Boston, Mass., for plaintiff.

Edward H. Horton, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., Andrew D. Sharpe, Sp. Asst. to Atty. Gen., and Francis J. W. Ford, U. S. Atty., and Arthur L. Murray, Sp. Asst. to U. S. Atty., both of Boston, Mass., on the brief), for the United States.

SWEENEY, District Judge.

In this action the plaintiff insurance company seeks to recover a portion of an alleged illegal additional assessment and collection of taxes assessed against the plaintiff for the calendar year 1926.

A stipulation and a supplemental stipulation of facts have been filed by the parties, in addition to which testimony was taken in open court. I find that all of the facts

stipulated between the parties hereto are true and correct. From the foregoing, the following findings of fact are made:

The plaintiff is a stock corporation duly organized and existing under the laws of the commonwealth of Massachusetts, with its principal place of business in the city of Worcester. Thomas W. White was from December 1, 1925, to August 31, 1933, collector of internal revenue for the district of Massachusetts, but was not in office at the commencement of this action. The plaintiff during the calendar year 1926 was engaged, and had been for many years, in writing accident and health insurance, and was taxable for the calendar year 1926 as an insurance corporation, other than life or mutual, under the provisions of sections 246 and 247 of the Revenue Act of 1926, 44 Stat. 48, 49.

Since 1919, the plaintiff has been issuing a type of accident and health policy which is noncancellable, and which the insured may keep in force until reaching the age of 70 by merely paying the premiums. The premiums are constant and fixed until the insured reaches the age of 50, at which time an increased fixed and constant premium is determined by the company.

The policies require quarterly premiums payable in advance on December 1, March 1, June 1, and September 1, of each year. Prior to the year in question—1926—the plaintiff, in filing its tax return, had submitted with it a copy of its annual statement to the insurance departments of the various states in which it conducted business, approved as to form by the National Convention of Insurance Commissioners, and commonly known as the "Convention Edition," setting forth therein a statement of its income and disbursements, assets and liabilities, and other pertinent information in detail.

On or about March 15, 1927, the plaintiff filed a tax return for the calendar year 1926, disclosing a taxable net income of $145,076.80, and a tax liability of $18,134.60, which was paid in four quarterly installments during that year.

During the year 1926, the plaintiff received and reported, in its annual statement, gross premiums of $6,505,844.38, and net premiums, after deducting "Return Premiums on Policies Cancelled" and "Premiums on Policies not Taken," amounting to $6,492,594.96. It therein reported on page 5, line 25, that part of the net premiums received on all its policies porportioned to the unexpired term of the period for which the premiums were received, the sum of $1,455,607.65, and on page 5, line 25½, the sum of $1,241,098.68, designated "Additional Reserve on Non-Cancellable Accident and Health Policies." For the year 1925 the corresponding figures reported on page 5, line 25, were $1,398,100.22, and on line 25½, $750,000.

The Commissioner assessed against the plaintiff a deficiency for the year 1926, in the sum of $28,368.21, with interest thereon in the amount of $6,868.99, making a total of $35,237.20. A credit for over-assessment for the 1928 return in the amount of $13,972.80 was applied against the 1926 deficiency. A check dated July 29, 1931, was issued to the plaintiff in the amount of $977.75 as interest on this assessment. Thereafter the plaintiff paid the balance due on the deficiency assessment, namely, $21,264.40.

On January 5, 1933, the plaintiff filed a claim for refund for the entire sum of $35,237.20, and on October 16, 1933, a disallowance of this claim for refund was scheduled, and the plaintiff was notified.

In this action the plaintiff claims that the amount of $750,000 was the proper amount to be taken on line 25½ of its annual statement as of December 31, 1925, instead of the amount of $900,890 determined by the Commissioner for such date in assessing the tax for 1926. In computing the tax assessed against the plaintiff, and paid by it for the year 1925, the Commissioner used the figure $750,000, as shown on line 25½, page 5, of the annual statement for 1925. The effect of the Commissioner's determination was to include, in the plaintiff's "premiums earned" for 1926, the difference between such amounts, or $150,890, representing an additional tax of $18,861.25, plus interest of $4,567.04, making a total of $23,428.29, which the plaintiff now seeks to recover, with interest thereon.

The plaintiff computed the amounts set forth on line 25, page 5, of its annual statement for the respective years 1925 and 1926 by deducting 66⅔ per cent. or a pro rata part of the quarterly premiums on insurance in force as of December 1, in each year, on all policies on which quarterly premiums were paid on December 1. In addition the plaintiff included in the amount so shown the amount of premiums paid in advance on all policies written.

In making up its annual statement, the following figures were taken under line 25 for the years designated:

| | |
|---|---|
| 1922 | $1,087,076.66 |
| 1923 | 1,222,551.47 |
| 1924 | 1,311,266.25 |
| 1925 | 1,398,100.22 |
| 1926 | 1,455,607.65 |

These figures were accepted by the insurance departments of all the states in which they were filed.

The total premiums written for the corresponding years were as follows:

| | |
|---|---|
| 1922 | $4,285,082.39 |
| 1923 | 4,944,445.91 |
| 1924 | 5,554,003.06 |
| 1925 | 6,070,059.76 |
| 1926 | 6,492,594.96 |

Prior to 1922, the plaintiff had set up on its books no additional reserve on noncancellable policies similar to that shown on page 5, line 25½, of its annual statement for subsequent years. In March, 1923, the superintendent of insurance of New York compelled the setting up of reserves on noncancellable policies such as here involved. Before the results of its own experience could become known, the plaintiff set up in its books as of December 31, 1922, an arbitrary reserve of $75,000 for this type of contract, and on December 31, 1923, increased this sum to $150,000. After the study of its 1921 experience became known, it was apparent that the reserves were too low, and on December 31, 1924, the sum of $375,000 as an additional reserve was set up, and reported on page 5, line 25½, of its 1924 annual statement. In 1925, because of the growth of sales of the type of policy involved, the superintendent of the New York insurance department suggested that further reserves should be set up. On September 30, 1925, it increased the additional reserve (line 25½ of its annual statement) from $375,000 to $500,000. After some further discussions with the insurance department of New York, on December 31, 1925, the plaintiff set up an additional reserve of $750,000 (line 25½ of its annual statement). The superintendent of insurance of New York, who took the lead and was followed by all other insurance commissioners in states where the plaintiff did business, set up a formula for the determination of the proper reserves as of December 31, 1925, but,

after consulting the actuaries employed by the plaintiff, accepted the additional reserve of $750,000 held on December 31, 1925, as sufficient.

In 1926 the plaintiff decided on its own initiative that there should be added to the $750,000 additional reserve on this type of policy held on December 31, 1925, a sum equal to 8 per cent. of the premiums collected during the year 1926. Thereafter the plaintiff's directors fixed the additional reserve as of December 31, 1925, by adding the sum of $491,098.68, so that the additional reserve on noncancellable health and accident policies set up by the plaintiff on its books and held as of December 31, 1926 (line 25½ of its annual statement); in addition to the 66⅔ per cent. reserve as shown on line 25, was $1,241,098.68. This figure was accepted by the insurance department of New York, and all other states in which the plaintiff did business. All reserves set up by the plaintiff in subsequent years were accepted by the insurance department of New York, and all of the states in which the plaintiff did business.

In all of its tax returns, the Commissioner of Internal Revenue has allowed as an exclusion from gross income, through the 9 years' period between 1922 and 1930, the increase in additional noncancellable reserve from 0 (1921) to $1,868,743 (1930), except a part of the increase between the beginning and end of 1926, such part consisting of the difference between $750,000, the additional reserve at the beginning of 1926, and $900,890, the figure estimated in 1930 as a reserve which would have been set up for the beginning of 1926 if the experience of 1927–29 had been known and computed on December 31, 1925.

The question involved in the present controversy is whether the plaintiff in computing its "premiums earned" for the year 1926, under the provisions of section 246 (b) (5) of the Revenue Act of 1926, 44 Stat. 49, was entitled to exclude therefrom the net addition made during that year to its additional reserve which it was required by state laws to be maintained on December 31, 1925, and December 31, 1926.

The method used by the National Convention of Insurance Commissioners, and by the insurance departments of various states for computing the "unearned premiums" on policies of insurance, other than life, is based on the assumption that

the volume of the insurance written is uniform throughout the year; that is, that as many policies of a given type are written on the first day of the year as on the last, and that as many are written on June 30th as on July 1st. If all policies written by a company in a given year are 1-year policies, upon the basis of the assumption made, the average life of all policies written is 6 months, and consequently 6 months of the premium or one-half of it is earned while the balance at the end of the year is unearned.

The Massachusetts statutes, G.L. c. 175, § 10, as amended by St.1924, c. 406, § 3, in effect during 1926, provide that: "The commissioner shall determine the liability of a company other than a life company, upon its contracts of insurance, excepting marine insurance, and the amount the company shall hold as a reserve for reinsurance by charging as a liability fifty per cent of the premiums written on its policies, or the actual unearned portions of such premiums."

The statutes under which these taxes were levied and collected, sections 246 and 247 of the Revenue Act of 1926, 44 Stat. 48, 49, provide as follows:

Section 246 (b), 44 Stat. 49 "In the case of an insurance company subject to the tax imposed by this section * * *

"(5) The term 'premiums earned on insurance contracts during the taxable year' means an amount computed as follows:

"From the amount of gross premiums written on insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance. To the result so obtained add unearned premiums on outstanding business at the end of the preceding taxable year and deduct unearned premiums on outstanding business at the end of the taxable year."

It is on the construction of section 246 (b) (5) that the respective parties do not agree. The plaintiff contends that the words "unearned premiums" mean not only the pro rata portion of the premium collected for the period which has yet to run, but; in addition to that, a reserve to be set up to take care of the increased risk, or additional cost of insurance, in the later years of the insured's life. This being based upon the fact that the cost of insurance on a young person is less than in his later years. Where the premiums charged are constant, with the ex-

ception of one change at the age of 50, apparently it is the opinion of the insurance commissioners and the insurance companies themselves that some of the premiums collected in the early years should be allocated to absorb the cost of the risk in later years.

On the other hand, the government contends that the words "unearned premiums" are strictly limited to that portion of the premium covering the unexpired term of the period for which it is paid, prorated over that period.

Under section 246 (b) (1) "gross income" is defined as meaning the combined gross amount earned during the taxable year, from investment income and from underwriting income, as provided in this subdivision, computed on the basis therein set forth. Subdivision (4) defines "underwriting income" as meaning the premiums earned on insurance contracts during the taxable year less losses and expenses incurred. Subdivision (5) provides that "premiums earned on insurance contracts during the taxable year" means an amount computed as follows: "From the amount of gross premiums written on insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance. To the result so obtained add unearned premiums on outstanding business at the end of the proceeding taxable year and deduct unearned premiums on outstanding business at the end of the taxable year."

This case will turn upon the definition of "unearned premiums" as used in section 246 (b) (5). The difficulty in the case seems to be engendered by the confusion of what is necessary for reserves with what is actually an unearned premium.

## Conclusions of Law.

Having in mind that the tax is imposed upon net income, it is clear that the Congress had in mind taxing whatever the company receives as premiums less the deductions provided in sections 246 and 247. I am of the opinion that there is no necessary relation between reserves and unearned premiums. The reserve called for by the commissioners of the various states is something that in their opinion is adequate to protect its policyholders from the danger of insolvency of the company or its inability to meet its contractual obligations. At the time that a given premium is received, it cannot

be assumed that the assured will take advantage of his right to renew his policy from year to year, nor can I find from the evidence before me that the total premium collected from the insured in any one period or year, even in the latest years during which he is entitled to have his policy, is inadequate to take care of the risk or loss of insurance during that period or year. It may be that the profit during that period or year is less, but inadequacy has not been shown. When on December 31, 1926, the plaintiff accepted a given sum of money to cover a definite and fixed period, namely, 3 months, it accepted that premium as a payment for insurance for 3 months only. Every time later that it accepted a quarterly premium from an insured it did likewise. It guaranteed nothing to the insured other than his policy would be kept alive and in force during the ensuing 3 months. If an insured chose not to renew his policy at the end of the 3 months, there was no cash surrender value available to him, and what would happen to any reserve that might have been set up on this policy does not appear, except that it would not be payable to the former insured. That the company may have been compelled to take some portion of either the earned or unearned premium to set up a reserve to guaranty its solvency is of no importance so far as the taxing statutes go. On December 31, 1926, approximately one-third of the quarterly premiums paid on December 1, 1926, were earned. The other two-thirds were unearned premiums within the meaning of section 246 (b) (5).

I do not feel that Congress ever intended to be bound to allow as a deduction any amount determined by the commissioners of the various states as needed for a reserve. I think that Congress intended to tax the income of insurance companies received during the taxable period, allowing deductions for any term that was to run beyond it, limiting such deduction to the period for which the premium had been paid and received.

■ The plaintiff has further urged that because the Commissioner has for a great many years allowed such a procedure as the plaintiff now urges, that it ought not to be heard to question a practice which it condoned. The government's answer is that such rulings as the Commissioner may have made, which would serve to encourage the practice in which the com-

panies have indulged, were in fact erroneous in law, which, but for the statute of limitations they would attempt to correct.

I am not persuaded in this decision that there is any necessity for resort to the construction placed upon the act by the Treasury Department. My decision is rather based on what I consider to be a fair interpretation of the words of the statute.

The plaintiff's motion for judgment is denied. The plaintiff's requests for rulings Nos. 4, 5, 6, and 7 are denied. The defendant's motion for judgment is allowed. Judgment may be entered for the defendant in accordance with the above.